**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-388 (CJN)** |
| **v.** | : | |
| | : | |
| **WESTON SOBOTKA,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Weston Sobotka to 21 days' incarceration, 36 months' probation, 60 hours' community service, and $500 restitution.

**I.      Introduction**

Defendant Weston Sobotka, a 26-year-old project manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Defendant Sobotka pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because (1) before entering the U.S. Capitol building, Sobotka spent almost an hour watching and videotaping chaos and violence on restricted Capitol grounds, including tear gas in the air and rioters attacking a line of police officers with a giant Trump sign; (2) before entering the Capitol building, Sobotka was fully

1

aware that rioters were attacking police and attempting to breach the Capitol building on multiple sides, as he observed violence and chaos on both the West and East fronts outside of the Capitol building; (3) Sobotka entered the Capitol building as part of a violent mob that overwhelmed the police and caused a major breach of the building; (4) once the mob breached the Capitol building doors, Sobotka advised other rioters entering the building to hold the doors open so additional rioters could enter ("Hold the door open. Hold that door. It will autolock"); (5) Sobotka stayed inside the building for almost half an hour (28 minutes), taking video and photos; and (6) Sobotka minimized and celebrated his conduct, sending a selfie image to a friend from inside the Rotunda captioned, "I'm storming the [Capitol] haha"; and (7) Sobotka has not yet demonstrated remorse for his conduct on January 6, 2021.

The Court must also consider that Sobotka's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building and disruption of the proceedings. Here, the facts of and circumstances of Sobotka's crime support a sentence of 21 days' incarceration, 36 months' probation, 60 hours' community service, and $500 restitution in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 17 (Statement of Offense), at ¶¶1-7.

*Defendant Sobotka's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Sobotka traveled from his residence in Virginia to Washington, D.C. to attend the "Stop the Steal" rally and election-related events. ECF 17 ¶ 8. He attended the rally and then walked to the U.S. Capitol complex with a crowd of people. *Id.*

At about 2:30 p.m., Sobotka joined a mob that had gathered on the East side of the Capitol building. *Id.* ¶ 9. While there, he witnessed violent clashes between rioters and police officers attempting to prevent entry into the Capitol building. *Id.* Sobotka witnessed the deployment of crowd control measures by police, including tear gas. *Id.*

Despite witnessing these red flags, Sobotka followed the mob and entered the Capitol through the Rotunda Doors (also known as the East Rotunda/Columbus Doors) at 3:02 p.m. *Id.* 10. While inside, Sobotka moved through the Capitol with other protestors and took pictures and videos. *Id.* ¶ 10. Images 1-4, below, are screenshots of CCTV video showing Sobotka visiting multiple locations throughout the Capitol building:



*Image 1*



*Image 2*



*Image 3*



*Image 4*

Sobotka remained inside the Capitol building for 28 minutes with the crowd until it was pushed out by police at 3:30 p.m. *Id*. ¶ 10. While inside the building, he sent at least one selfie-style photo from inside the Rotunda to a friend.  The photo was captioned, "I'm storming the [Capitol] haha." *Id*. Image 5, below, is a copy of the selfie and the text message Sobotka sent from the Rotunda:



*Image 5*

*January 6 Videos from Sobotka's Seized Phone*

The FBI seized Sobotka's phone during his arrest on August 23, 2022. Upon a review of its contents, investigators located several videos recorded by Sobotka on January 6, 2021, which show the Capitol riot from his perspective. Sobotka recorded videos of the riot on the West front and of his entrance into the building on the East front.[1] The videos confirm that Sobotka witnessed violence on both the West and East sides of the Capitol prior to entering the building. On the West front at about 1:40 p.m., Sobotka witnessed a giant Trump sign being pushed into a line of police officers (Exhibit 3 - IMG_6888.MOV). He then walked around the Capitol building, through the

---

[1] The government will submit full-length versions of the videos to the Court by file-sharing service.

throngs of rioters, to the East front, where he joined a large mob on the East steps of the building. Image 6, below, is a screenshot from a video (Exhibit 7 - IMG_6893.MOV) recorded by Sobotka showing the crowd assembled on the East front at approximately 2:23 p.m.:



*Image 6 (Exhibit 7 Timecode: 0:00 – 0:13)*

Sobotka made his way up through the crowd and closer to the Rotunda Doors. He could see police on the outside and inside of the doors, as well as broken windowpanes. Image 7, below, is a screenshot from a video (Exhibit 8 - IMG_6897.MOV) recorded by Sobotka at about 2:37 p.m. showing Capitol police officers (circled in blue) protecting the doors:



*Image 7 (Exhibit 8 Timecode: 0:00 – 0:07)*

At about 2:39 p.m., rioters forced open the Rotunda Doors. Sobotka's recorded video (Exhibit 11 - IMG_6902.MOV) shows rioters from the inside attempting to exit while rioters from the outside were attempting to push forward into the Capitol building. Image 8, below, is a screenshot from that video showing Sobotka pushing with the mob towards the Rotunda Doors:



*Image 8 (Exhibit 11 Timecode: 3:26)*

At about 2:43 p.m., Sobotka witnessed rioters attempt to steal the shield of an officer (pictured above in *Image 8*) by pulling the shield and the officer out of the doorway. Sobotka continued to push forward with the mob toward the doors. While some rioters were exiting the building, Sobotka stated to other rioters, ". . . Hey, pass the message along. We broke through from the back. That's why we're pushing out this way. We took it. The whole back mob broke through. And they stormed the b*tch." Exhibit 11 (Timecode: 8:01). In another video (Exhibit 15 - IMG_6907.MOV) taken from the same vantagepoint, Sobotka can be heard advising rioters entering the building, "Hold the door open. Hold that door. It will autolock." Exhibit 15 (Timecode: 0:17 – 0:21). Images 9-10, below, are screenshots from that video showing Sobotka entering the Capitol building and the Rotunda, respectively, at approximately 3:02 p.m.:



*Image 9 (Exhibit 15 Timecode: 0:47)*



*Image 10 (Exhibit 15 Timecode: 1:08)*

*Sobotka's Post-arrest Interview with the FBI*

On August 23, 2022, Sobotka was interviewed by the FBI following his arrest. He told agents that he attended the political rally prior to walking to the Capitol. He initially arrived on the West side of the building. He witnessed "scuffles" break out in the crowd and tear gas in the air. Sobotka then walked around to the East side of the Capitol building. There, he witnessed "scuffles" between rioters and police near the Rotunda Doors. Sobotka said he was curious about entering the building, so he made his way toward the entrance. As he got closer, the doors opened. A group of rioters from the inside were exiting as rioters on the outside were entering at the same time. Sobotka made his way inside the building with the crowd. After entering, Sobotka walked around and explored the building. He took a selfie (*Image 5, above*) in the Rotunda and sent it to a friend, which is what ended up getting him fired from the job he had at the time. Sobotka stated that, at some point, he wanted to exit the building but could not, due to clashes between rioters and police at the doors. Sobotka claimed that, once rioters on the outside were cleared, the doors opened, and he exited. He then left the Capitol grounds and went home.

*The Charges and Plea Agreement*

On August 17, 2022, the United States charged Sobotka by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 23, 2022, police officers arrested him during a traffic stop in Ashburn, Virginia. On November 28, 2022, the United States charged Sobotka by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 9, 2023, pursuant to a plea agreement, Sobotka pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Sobotka agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Sobotka now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 21 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp.3d 1, 8 (D.D.C. 2021). While assessing Sobotka's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Sobotka, the absence of violent or destructive acts is not a mitigating factor. Had Sobotka engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Sobotka's case is how he entered the Capitol building. Sobotka observed the red flags that should have alerted him that he was joining a violent mob storming the U.S. Capitol building. He initially went to the West side of the Capitol, where he witnessed clashes between rioters and police and the presence of tear gas. Instead of leaving Capitol grounds, Sobotka proceeded to the East side of the Capitol, where he again witnessed clashes between rioters and police. This time, he proceeded forward into the Capitol building with the mob. He advised other rioters to hold the door open so that even more rioters could enter the building. He stayed inside the building for 28 minutes. From inside the building, he took selfies and texted a friend, stating, "I'm storming the [Capitol] haha." He stayed inside until police cleared that mob out of the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B. The History and Characteristics of Sobotka**

As set forth in the PSR, Sobotka's criminal history consists of two 2019 arrests and convictions for driving under the influence and possession of marijuana. PSR ¶¶ 23, 25. He is currently employed as a project manager. PSR ¶¶ 44, 50-54. He appears to have had a good childhood and upbringing, which makes his decisions on January 6, 2021 all the more troubling. PSR ¶¶ 28-34.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

13

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This

was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The sentence imposed should be designed to specifically deter Sobotka from committing future crimes. His conviction in this case is not his first encounter with the justice system. His conduct on January 6, 2021 demonstrated a further lack of respect for the law and a complete disregard for the gravity of the situation and the danger that the mob created for police, members of Congress, and their staff. Prior to entering the building, Sobotka witnessed clashes between police officers and rioters. He nevertheless walked right by those officers as he entered the building. His lack of appreciation of the seriousness of his conduct on January 6, 2021 is further apparent from the selfie image and caption, "I'm storming the [Capitol] haha" he sent from inside the Capitol building. Although Sobatka accepted responsibility by confessing his conduct and pleading guilty at an early stage, he has not yet demonstrated genuine remorse for his conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Court must sentence Sobotka based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Sobotka has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*,

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C.

Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense

has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *U.S. v. Diana Santos-Smith*, 21-cr-271, the defendant pled guilty to one count of 5104(e)(2)(G) and was sentenced to 20 days' incarceration and 3 years' probation. With her co-defendant, she twice entered the Capitol via the Senate Wing Door, climbing through a broken window just north of the Door the first time and remaining inside two minutes and climbing through a broken window just south of the door the second time and remaining inside for over one minute. Sobotka did not enter the building twice. However, he stayed inside the Capitol for 28 minutes, which is 25 minutes longer than Santos-Smith.

In *United States v. Blas Santillan*, 22-cr-32, defendant Santillan also pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Similar to Sobotka in the instant case, Santillan entered the Capitol Building by storming through the Rotunda Doors with other rioters; he remained in the Capitol building for almost half an hour (25 minutes);  he observed violent clashes with police; he used his cell phone to send recordings of himself inside the Capitol building during the riot (posting SnapChat videos of himself); he encouraged other rioters outside of the Rotunda Doors to enter the Capitol building (telling them to "storm in there"); he was forced out of the Capitol building

by officers in riot gear; and he did not show remorse.  Unlike Sobotka, Santillan had a more serious criminal history.  Judge Pan sentenced Santillan to 45 days' jail time and 36 months' probation.

In *United States v. John Getsinger*, 21-cr-607, defendant Getsinger also pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Similar to Sobotka in the instant case, Getsinger observed, before entering the Capitol building, rioters fighting the police outside of the Capitol building; he breached the Capitol building through the Rotunda Doors, joining a large mob of other rioters who overpowered the police to gain entry; he remained in the Capitol for a significant period of time (approximately 39 minutes); he took video while inside the Capitol which he streamed on Facebook; and he initially expressed no remorse for his actions.  Unlike Sobotka, Getsinger appeared to have smoked marijuana in the Capitol and made it to the door of a congressman's office. Judge Sullivan sentenced Getsinger to 60 days' jail time and 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.[3]

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 21 days' incarceration, 36 months' probation, 60 hours' community service, and $500 restitution. Such a sentence protects

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 7th day of April 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov